*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

*In re* GUARDIANSHIP OF GM.

---

DEPARTMENT OF HEALTH AND HUMAN SERVICES,

      Petitioner-Appellee,

v

GM, protected person,

      Respondent-Appellant,

and

APRIL MADDY, Guardian of GM,

      Appellee.

UNPUBLISHED
September 08, 2025
1:26 PM
APPROVED FOR
PUBLICATION
October 24, 2025
11:55 AM

No. 373743
Kalkaska Probate Court
LC No. 24-011095-GA

---

*In re* CONSERVATORSHIP OF GM.

---

DEPARTMENT OF HEALTH AND HUMAN SERVICES,

      Petitioner-Appellee,

v

GM, legally incapacitated person,

      Respondent-Appellant,

No. 373744
Kalkaska Probate Court
LC No. 24-011096-CA

-1-

and

APRIL MADDY, Conservator of GM,

        Appellee.

_____

Before:  SWARTZLE, P.J., and GARRETT and YATES, JJ.

YATES, J.

In this consolidated matter,[1] GM, a purported legally incapacitated adult, appeals of right the trial court's orders granting the petitions of the Department of Health and Human Services (the DHHS) for a guardianship and a conservatorship over GM.  Because the DHHS did not offer clear and convincing evidence that GM was legally incapacitated, we vacate the orders of guardianship and conservatorship, and we remand for further proceedings.

## I. FACTUAL BACKGROUND

In February 2024, the Kalkaska County Sheriff's Department performed a welfare check on GM, and the deputies detected a strong odor of feces outside her home.  GM told the deputies that there were many dogs inside the home, some of which had died from parvo virus.  Once inside, the deputies observed that GM's home was in disarray and filthy, with dog feces on the floor.  GM explained that she kept the dogs inside and allowed them to relieve themselves indoors to mitigate the spread of parvo virus.  GM's son David, who lived in Germany, commented that GM was not mentally well and could not take care of the dogs.  He also expressed the belief that the home was uninhabitable.  The DHHS's Adult Protective Services became involved, and the Kalkaska County Sheriff's Department executed a search warrant and removed the animals from GM's home.

In March 2024, the DHHS filed a petition to establish a guardianship and a conservatorship over GM.  The proposed guardian and conservator was a resident of Ohio whom the DHHS alleged was GM's friend, but GM denied knowing her.  A guardian ad litem was appointed for GM, and the trial court compelled GM to undergo a psychological evaluation.

Dr. Eric R. Harvey performed a psychological evaluation of GM and noted her attendance at University of Michigan for a year and a half, as well as UCLA, the University of San Francisco, Northwestern California University School of Law, and Magna Carta College of Law.  GM further represented that she worked with primates and was the first to teach them sign language, then she transitioned to real estate, worked as a secretary at a law firm, and became a teacher.  Dr. Harvey noted that GM was exceptionally tangential and exhibited some delusional thinking, but the tests he administered revealed that GM had either average or above-average cognitive abilities, although

_____

[1] *In re Guardianship of GM*, unpublished order of the Court of Appeals, entered May 22, 2025 (Docket Nos. 373743, 373744).

one test did indicate some cognitive decline. Dr. Harvey consulted GM's son David, but not GM's daughter April, who lived in Michigan, because David claimed April also had mental-health issues. David confirmed that GM's educational and vocational history was accurate, but reported that the condition of GM's home has been a lifelong issue, and he described GM as a hoarder. Dr. Harvey concluded that, despite GM's test results, she was experiencing cognitive decline because someone with such an educational history necessarily should have had a higher cognitive function to begin with, so the results that were merely average logically must represent a decline. He also noted that it was strange that, during the clock test, GM drew hash marks on the dial of the clock, as opposed to numbers, as instructed. Dr. Harvey diagnosed GM with an unspecified neurocognitive disorder and, based entirely on David's assertion, a hoarding disorder. Dr. Harvey concluded that GM was a legally incapacitated person, and that a guardianship and a conservatorship were warranted.

For a second opinion, GM received a psychological evaluation performed by Kyle Scott. During the evaluation, GM asserted that she was in the process of obtaining a juris doctor from the JFK School of Law at National University, and she claimed that she is politically involved because she consults with United States Presidents by sending them e-mails at the White House's website. Also, GM insisted that her son David was trying to take her assets, that he has no morals, and that he has been in trouble his whole life. Scott spoke with April, but not David, during the assessment. April said that GM has been like that her whole life, and that many people—including David—do not understand GM. April noted that GM "has always marched to the beat of her own drum" and she is able to care for herself when she wants, but she needs counseling. Scott performed many of the same assessments as Dr. Harvey, and a dispute later arose as to whether one test was improperly administered within a 30-day period of a previous assessment, which would yield a higher score. Regardless, all the assessments Scott performed revealed that GM was cognitively functioning at either an average or above-average level—consistent with the tests administered by Dr. Harvey— but Scott noted that GM's social skills were a relative weakness. Scott concluded that there was insufficient evidence to support a guardianship or a conservatorship, but Scott recommended that GM establish a power of attorney and seek counseling. Scott later testified that criminal behavior or poor decision-making is insufficient to establish a lack of sufficient capacity to make decisions. Instead, should GM not avail herself of counseling or social services, and if GM continued to make poor decisions for her physical or mental health, then Scott might reevaluate his conclusion.

The guardian ad litem reported that GM's home no longer had feces on the floor, but the house had a strong odor. The guardian ad litem described GM as "intelligent and eccentric." The guardian ad litem's report recommended that the trial court consider whether GM has always been that way, or whether GM was losing the ability to care for herself and her home due to cognitive decline and mental-health challenges.

Adult Protective Services caseworker Kelly Schaub testified that, when she visited GM's home in February 2024, it was in disarray and filled with dog feces. In addition, the food in GM's refrigerator was black with mold. Subsequent visits to GM's home revealed that it had a strong odor of feces and urine, but the condition of the house had improved slightly, and the feces had been removed. By November 2024, GM had taken in two tenants, both of whom had criminal records. GM's electricity was at risk of being shut off because she was in arrears by approximately $3,900, and she had once been in arrears on a home-equity line of credit in the amount of $4,279.18, but she had brought that up to date. Schaub expressed concerns about GM's ability to manage her finances and GM's delusional thinking. April testified that she helped GM arrange for cleaners to

-3-

come to the house, which resulted in a noticeable difference. She further stated that GM had had difficulty paying her utilities in the past, but GM had sought assistance before. April was unaware of the electricity being shut off in the preceding ten years. April explained that GM had never kept her house tidy and had lived in those conditions for decades. April claimed that GM had displayed some delusional thinking throughout her entire life, but GM was competent to manage her affairs and her health. Also, April testified that GM had a long history of taking in tenants, many of whom had criminal records, and GM did so without any issues.

During the course of the proceedings, the parties tried to resolve the matter by establishing a durable power of attorney for GM, which the trial court would have accepted, but GM ultimately did not agree with that resolution.[2] At the conclusion of the proceedings, the trial court found there was "more than sufficient" clear and convincing evidence that GM required a guardian. The court deemed Scott's assessment of GM invalid in its entirety because one of the administered tests was improperly conducted within 30 days of a previous administration of it, and the court decided that Dr. Harvey's assessment and testimony carried more weight. Schaub's observations, coupled with Dr. Harvey's conclusions, demonstrated that GM was unable to recognize her own basic needs or her need for mental-health treatment. In addressing the conservatorship, the trial court cited GM's prior arrearage on her home-equity line of credit, her current arrearage on her electricity bill, and her decision to take in tenants with criminal records. The trial court granted the petitions for both a guardianship and a conservatorship over GM, but concluded that the only viable solution was to assign April both roles. GM now appeals.

## II. LEGAL ANALYSIS

On appeal, GM asserts that the trial court abused its discretion by granting the petitions for a guardianship and a conservatorship because the DHHS did not establish, by clear and convincing evidence, that GM was an incapacitated person when both psychological evaluations determined GM was of average intelligence. "We review the probate court's dispositional rulings for an abuse of discretion." *In re Redd Guardianship*, 321 Mich App 398, 403; 909 NW2d 289 (2017). A trial court abuses its discretion when it chooses an outcome outside the range of reasonable and principled outcomes. *In re Bibi Guardianship*, 315 Mich App 323, 329; 890 NW2d 387 (2016). "We review the probate court's findings of fact for clear error." *In re Redd Guardianship*, 321 Mich App at 403. A factual finding is clearly erroneous "when this Court is left with a definite and firm conviction that a mistake has been made." *Id.* (quotation marks and citation omitted).

---

[2] Under Michigan law, "[a] person executing a will must have testamentary capacity, i.e., be able to comprehend the nature and extent of his property, to recall the natural objects of his bounty, and to determine and understand the disposition of property which he desires to make," so "powers of attorney must be executed by mentally competent persons." *Persinger v Holst*, 248 Mich App 499, 504; 639 NW2d 594 (2001) (quotation marks and citations omitted). The trial court initially was willing to permit GM to execute a power of attorney, but the trial court ultimately found that GM was legally incapacitated for the purpose of a guardianship and a conservatorship. Those two approaches are incompatible; either GM possesses sufficient legal capacity, or she does not.

This Court reviews de novo any statutory or constitutional interpretation by the probate court. *Id*. at 404.

The Estates and Protected Individuals Code (EPIC), MCL 700.5301 *et seq*., allows for the appointment of guardians for incapacitated individuals and the establishment of conservatorships, but the need for a guardianship or a conservatorship must be demonstrated by clear and convincing evidence. MCL 700.5306(1) and MCL 700.5406(7). The clear-and-convincing-evidence standard is "the most demanding standard applied in civil cases," and it is satisfied only when the evidence "produces in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established," and it is "so clear, direct and weighty and convincing as to enable the factfinder to come to a clear conviction, without hesitancy, of the truth of the precise facts in issue." *In re Martin*, 450 Mich 204, 227; 538 NW2d 399 (1995) (quotation marks and citation omitted). "Evidence may be uncontroverted, and yet not be 'clear and convincing.'" *Id*. (citation omitted). Conversely, evidence may be clear and convincing despite the fact that it has been contradicted. *Id*. As this Court has held regarding conservatorships:

> Difficulties with math and memory plague many elderly (and not so elderly) individuals. These irksome attendants to the aging process are not necessarily disabling. Poor subtraction skills and relatively low cognitive-ability testing scores hardly render a person mentally ill or mentally deficient, or even incapable of making rational decisions regarding one's bounty. In our view, clear and convincing evidence that a person "is unable to manage property and business affairs effectively" requires more than low marks on arithmetic or memory tests, or inconsistent ineptitude in balancing a checkbook. [*In re Conservatorship of Bittner*, 312 Mich App 227, 239; 879 NW2d 269 (2015).]

With regard to guardianships, MCL 700.5306(1) provides that:

> The court may appoint a guardian if the court finds by clear and convincing evidence both that the individual for whom a guardian is sought is an incapacitated individual and that the appointment is necessary as a means of providing continuing care and supervision of the incapacitated individual, with each finding supported separately on the record. Alternately, the court may dismiss the proceeding or enter another appropriate order.

An " '[i]ncapacitated individual' means an individual who is impaired by reason of mental illness, mental deficiency, physical illness or disability, chronic use of drugs, chronic intoxication, or other cause, not including minority, to the extent of lacking sufficient understanding or capacity to make or communicate informed decisions." MCL 700.1105(a).

A trial court may appoint a conservator if the court makes both of the following findings:

> (a) The individual is unable to manage property and business affairs effectively for reasons such as mental illness, mental deficiency, physical illness or disability, chronic use of drugs, chronic intoxication, confinement, detention by a foreign power, or disappearance.

(b) The individual has property that will be wasted or dissipated unless proper management is provided, or money is needed for the individual's support, care, and welfare or for those entitled to the individual's support, and that protection is necessary to obtain or provide money. [MCL 700.5401(3).]

Also, the court must exercise the power conferred by MCL 700.5401 through MCL 700.5433 "to encourage the development of maximum self-reliance and independence of a protected individual and shall make protective orders only to the extent necessitated by the protected individual's mental and adaptive limitations and other conditions warranting the procedure." MCL 700.5407(1).

In this matter, reports and testimony established that GM has regularly taken in potentially dangerous tenants. GM also has had difficulty with finances, maintained fanciful assertions about herself, and struggled to keep a clean living environment. The reported disarray and filth in GM's home was nothing new for her. Evidence established that her two psychological assessments resulted in findings that GM's cognitive functions were either average or above average. Nevertheless, Dr. Harvey concluded that GM was experiencing cognitive decline based largely upon his assumption that GM previously must have had a higher IQ.[3] Dr. Harvey further diagnosed GM with a hoarding disorder based entirely on the statements of David. Because of those two unsupported diagnoses, Dr. Harvey concluded that GM was an incapacitated individual, and the trial court explicitly found Dr. Harvey's conclusions credible, while disregarding Scott's assessment. But even disregarding Scott's assessment, and thereby leaving Dr. Harvey's report and testimony unrefuted, Dr. Harvey's assessment revealed that GM's cognitive functioning was average or above average. Dr. Harvey's diagnoses fall short of the clear-and-convincing standard, as his report and testimony do not leave us with the "firm belief or conviction as to the truth of the allegations sought to be established[.]" *In re Martin*, 450 Mich at 227.

In sum, we find insufficient evidence to establish that GM was an incapacitated individual under MCL 700.1105(a), leaving the first element for a guardianship under MCL 700.5306 unmet. Further, turning to the conservatorship, the DHHS did not offer clear and convincing evidence that GM suffered from "mental illness, mental deficiency, physical illness or disability, chronic use of drugs, chronic intoxication, confinement, detention by a foreign power, or disappearance," to the degree that it affected her financial wellbeing, as mandated by MCL 700.5401. To be sure, GM appears to have had lifelong difficulty properly caring for herself, both physically and financially, and we do not minimize the deplorable conditions that were observed inside GM's home. But the evidence presented thus far was insufficient to show that GM was so incapable as to warrant either a guardianship or a conservatorship. We recognize that additional evidence presented on remand

---

[3] If we accept Dr. Harvey's finding that a person of average cognitive functioning is nonetheless legally incapacitated, then the majority of Americans—who establish the "average"—would also be deemed legally incapacitated. Further, Dr. Harvey based his report and testimony primarily on his assumption that GM's cognitive abilities had declined, but such a decline does not bely the fact that, when Dr. Harvey evaluated GM, her cognitive performance was average, with the exception of one of his assessments.

may support a guardianship and a conservatorship, but the existing record does not support either result.

Vacated and remanded for further proceedings. We do not retain jurisdiction.

/s/ Christopher P. Yates
/s/ Brock A. Swartzle
/s/ Kristina Robinson Garrett